1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LISA JO WYATT,                        ) Case No. CV 12-3672-JPR
                                      )
                Plaintiff,            )
                                      )
        vs.                           ) MEMORANDUM OPINION AND ORDER
                                      ) AFFIRMING THE COMMISSIONER
                                      )
CAROLYN W. COLVIN,                    )
Acting Commissioner of                )
Social Security,[1]                   )
                                      )
                Defendant.            )
                                      )
_____

I.    PROCEEDINGS

     Plaintiff seeks review of the Commissioner's final decision
denying her applications for Social Security disability insurance
benefits ("DIB") and Supplemental Security Income benefits
("SSI").  The parties consented to the jurisdiction of the
undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).
This matter is before the Court on the parties' Joint
Stipulation, filed March 14, 2013, which the Court has taken

_____

     [1]    On February 14, 2013, Colvin became the Acting
Commissioner of Social Security.  Pursuant to Federal Rule of
Civil Procedure 25(d), the Court therefore substitutes Colvin for
Michael J. Astrue as the proper Respondent.

1

under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

**II.   BACKGROUND**

Plaintiff was born on August 31, 1964.  (Administrative Record ("AR") 110, 113.)  She completed high school and one year of college.  (AR 37, 159.)  She previously worked as a bus driver and a food demonstrator at grocery stores and markets.  (AR 38-39, 139, 155.)

On September 22, 2008, Plaintiff filed applications for DIB and SSI, alleging that she had been unable to work since March 24, 2005, because of several medical conditions, including neck and back injuries, right-elbow tendonitis, and knee problems.  (AR 39-40, 110-26, 154.)  After her applications were denied, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 69.)  A hearing was held on July 22, 2010, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (AR 34-49.)  In a written decision issued August 24, 2010, the ALJ found that Plaintiff was not disabled.  (AR 22-29.)  On February 28, 2012, the Appeals Council denied Plaintiff's request for review.  (AR 1-5.)  This action followed.

**III. STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d

742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is

currently engaged in substantial gainful activity; if so, the
claimant is not disabled and the claim must be denied.
§§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not
engaged in substantial gainful activity, the second step requires
the Commissioner to determine whether the claimant has a "severe"
impairment or combination of impairments significantly limiting
her ability to do basic work activities; if not, a finding of not
disabled is made and the claim must be denied.
§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a
"severe" impairment or combination of impairments, the third step
requires the Commissioner to determine whether the impairment or
combination of impairments meets or equals an impairment in the
Listing of Impairments ("Listing") set forth at 20 C.F.R., Part
404, Subpart P, Appendix 1; if so, disability is conclusively
presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii),
416.920(a)(4)(iii).  If the claimant's impairment or combination
of impairments does not meet or equal an impairment in the
Listing, the fourth step requires the Commissioner to determine
whether the claimant has sufficient residual functional capacity
("RFC")[2] to perform her past work; if so, the claimant is not
disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv),
416.920(a)(4)(iv).  The claimant has the burden of proving that
she is unable to perform past relevant work.  Drouin, 966 F.2d at
1257.  If the claimant meets that burden, a prima facie case of

_____

[2]   RFC is what a claimant can still do despite existing
exertional and nonexertional limitations.  20 C.F.R. §§ 404.1545,
416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th
Cir. 1989).

disability is established.  <u>Id.</u>  If that happens or if the
claimant has no past relevant work, the Commissioner then bears
the burden of establishing that the claimant is not disabled
because she can perform other substantial gainful work available
in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).
That determination comprises the fifth and final step in the
sequential analysis.  §§ 404.1520, 416.920; <u>Lester</u>, 81 F.3d at
828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

      B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in
any substantial gainful activity since March 24, 2005.  (AR 24.)
At step two, the ALJ concluded that Plaintiff had the severe
impairments of obesity and degeneration of the cervical spine,
lumbar spine, and bilateral knees.  (<u>Id.</u>)  At step three, the ALJ
determined that Plaintiff's impairments did not meet or equal any
of the impairments in the Listing.  (<u>Id.</u>)  At step four, the ALJ
found that Plaintiff retained the RFC to perform a limited range
of light work,[3] specifically, she could "stand and walk for no
more than six of eight hours, cumulatively"; "sit for no more
than six of eight hours, cumulatively"; only occasionally climb,

---

[3]   "Light work" is defined as involving "lifting no more
than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds."  20 C.F.R. §§ 404.1567(b),
416.967(b).  The regulations further specify that "[e]ven though
the weight lifted may be very little, a job is in this category
when it requires a good deal of walking or standing, or when it
involves sitting most of the time with some pushing and pulling
of arm or leg controls."  <u>Id.</u>  A person capable of light work is
also capable of "sedentary work," which involves lifting "no more
than 10 pounds at a time and occasionally lifting or carrying
[small articles]" and may involve occasional walking or standing.
§§ 404.1567(a)-(b), 416.967(a)-(b).

balance, stoop, kneel, crouch, or crawl; and never be exposed to unprotected heights or moving machinery.  (Id.)  Based on the VE's testimony, the ALJ concluded that Plaintiff was capable of performing jobs that existed in significant numbers in the national economy.  (AR 28-29.)  Accordingly, the ALJ determined that Plaintiff was not disabled.  (AR 29.)

**V.   DISCUSSION**

Plaintiff alleges that the ALJ's RFC finding and credibility determination lacked the support of substantial evidence.  (J. Stip. at 4.)

A.   The ALJ Did Not Err in Determining Plaintiff's RFC

Plaintiff contends that in determining her RFC, the ALJ erred by relying on the opinions of the consulting and reviewing physicians because they were rendered before her right-knee surgery and updated MRIs of her cervical and lumbar spine.  (J. Stip. at 5.)  Plaintiff further argues that in light of those later medical records, the ALJ should have "utilized the services of a medical expert" or "arranged for an updated orthopedic consultative examination."  (J. Stip. at 5-6.)  Remand is not warranted on this basis, however, because the ALJ properly determined Plaintiff's RFC.

1.   Applicable law

A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision.  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).  The ALJ must consider all the medical evidence in the record and "explain in [his or her] decision the weight given to . . . [the] opinions

6

1  from treating sources, nontreating sources, and other

2  nonexamining sources." 20 C.F.R. §§ 404.1527(e)(2)(ii),

3  416.927(e)(2)(ii). In making an RFC determination, the ALJ may

4  consider those limitations for which there is support in the

5  record and need not consider properly rejected evidence or

6  subjective complaints. See Bayliss, 427 F.3d at 1217 (upholding

7  ALJ's RFC determination because "the ALJ took into account those

8  limitations for which there was record support that did not

9  depend on [claimant's] subjective complaints"). The Court must

10  consider the ALJ's decision in the context of "the entire record

11  as a whole," and if the "evidence is susceptible to more than one

12  rational interpretation, the ALJ's decision should be upheld."

13  Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008)

14  (internal quotation marks omitted).

15          2.   Relevant facts

16  Plaintiff alleged that her knees began hurting when she was

17  working as a bus driver and that her back and elbow conditions

18  resulted from being rear-ended while driving a bus. (AR 39.)

19  She filed a worker's compensation case regarding her injuries.

20  (See AR 236-41.)

21  On May 4, 2005, Dr. Robert W. Hunt evaluated Plaintiff and

22  later completed a report as part of Plaintiff's worker's

23  compensation case. (AR 359-82.) Dr. Hunt noted that Plaintiff

24  was five feet four inches tall and weighed 275 pounds. (AR 369.)

25  She had normal range of motion of the neck but complained of

26  tenderness and pain with neck motion. (AR 370.) Plaintiff had

27  reduced range of motion of the elbows and knees and normal range

28  of motion of the hips. (AR 370, 374-75.) Her sensation was

7

decreased over the sole of her left foot but otherwise intact, and she had full motor power and reflexes. (AR 372, 376.) Plaintiff had normal gait and posture, some tenderness to palpation over the lumbar spine, no thoracic or lumbar muscle spasm, and full range of motion of the lumbar spine. (AR 373.)

Dr. Hunt diagnosed cephalgia, cerviothoracic strain, right-elbow strain, thoracolumbar strain, bilateral knee strain, and plantar fusion of the right foot. (AR 377.) He noted that Plaintiff's weight was "delaying her recovery" from her injury. (AR 379.) He prescribed Darvocet, a pain medication; Ativan and Soma, muscle relaxants; Relafen, a nonsteroidal anti-inflammatory agent; Lidoderm patches; and an anti-inflammatory topical ointment. (AR 378.) Dr. Hunt also recommended physical therapy, chiropractic therapy, braces and supports, a heating pad, biofeedback, and a weight-loss program. (AR 378-79.) Dr. Hunt believed that Plaintiff was temporarily totally disabled but estimated that she would be able to return to modified work in four to six weeks. (AR 380.)

On May 13, 2005, electromyographic and nerve-conduction studies were normal. (AR 393-97.) On May 27, 2005, an MRI of Plaintiff's right knee showed chondromalacia of the patella and a grade I sprain of the medial collateral ligament (AR 428), but MRIs of her left knee, right ankle, and right foot were normal (AR 427, 429-30). On June 21, 2005, a right-elbow MRI was normal. (AR 431.)

On June 6, 2005, a cervical-spine MRI showed at C2/3, disc desiccation with a 1.9-millimeter central-disc protrusion that produced mild spinal-canal narrowing; at C3/4 and C4/5, disc

8

1  desiccation with 1.9-millimeter disc bulges, mild spinal-canal
2  narrowing, and facet arthropathy producing mild neuroforaminal
3  encroachment; at C5/6, disc desiccation with a 3.9-millimeter
4  disc protrusion, mild spinal-canal narrowing, and bilateral facet
5  arthropathy producing mild bilateral neuroforaminal encroachment;
6  and at C6/7 and C7/T1, disc desiccation.  (AR 280.)  A
7  thoracic-spine MRI showed disc desiccation at T1/2 through T8/9;
8  2.1-millimeter disc protrusions at T5/6 and T6/7 that produced
9  mild spinal-canal narrowing; and a 1.5-millimeter disc protrusion
10 at T8/9 that produced mild spinal-canal narrowing.  (AR 417.)  A
11 lumbar-spine MRI showed a 2.3-millimeter disc bulge at L1/2 that
12 produced mild spinal-canal narrowing and mild bilateral
13 neuroforaminal encroachment; a 2.6-millimeter disc bulge at L2/3
14 that produced mild spinal-canal narrowing and mild bilateral
15 neuroforaminal encroachment; a 3.5-millimeter disc bulge at L3/4
16 that produced mild spinal-canal narrowing and mild to moderate
17 bilateral neuroforaminal encroachment; a 3.5-millimeter disc
18 bulge and facet arthropathy at L4/5 that produced mild to
19 moderate spinal-canal narrowing and mild bilateral neuroforaminal
20 encroachment; and mild hypolordosis of the lumbar spine.[4]  (AR
21 953-54.)

22     On December 8, 2005, Dr. Eduardo E. Anguizola, who was board
23 certified in pain management, performed a pain-management
24 evaluation of Plaintiff.  (AR 323-30.)  Plaintiff had normal
25 reflexes, intact cranial nerves, and normal sensation.  (AR 326.)

26

27     [4]   The MRI report first states that Plaintiff had a 2.6-
28 millimeter disc bulge at L3/4 but then states that she had a 3.5-
   millimeter disc bulge there.  (See AR 954.)

1  Her cervical spine had reduced range of motion with pain and

2  spasm; her thoracic spine had moderate muscle spasm with pain and

3  tenderness; and her lumbar spine had decreased range of motion

4  with pain, tenderness, and muscle spasm.  (AR 326-27.)  A

5  straight-leg-raising test was positive bilaterally.  (AR 327.)

6  Dr. Anguizola diagnosed cervical disc disease, bilateral cervical

7  facet arthropathy with cerviogenic headaches, cervical

8  radiculopathy, thoracic disc disease, lumbosacral disc disease,

9  bilateral lumbar radiculopathy, and bilateral lumbar facet

10 arthropathy.  (AR 328.)  He recommended lumbar steroid injections

11 and diagnostic facet blocks.  (AR 329.)

12     On January 20, 2006, orthopedic surgeon Timothy J. Hunt

13 evaluated Plaintiff's right knee.[5]  (AR 303-12.)  He noted that

14 Plaintiff weighed about 270 pounds and that her right knee had

15 tenderness, slightly decreased patellar mobility, decreased range

16 of motion, good sensation, and some hyperextension and flexion.

17 (AR 309-10.)  She had a negative straight-leg-raising test.  (AR

18 309.)  Dr. T. Hunt diagnosed right-knee patellofemoral syndrome

19 and chondromalacia.  (AR 310.)  He found that Plaintiff would

20 "[c]learly . . . do much better if she were about 120 pounds

21 lighter" and recommended that she lose weight and work on muscle

22 strengthening.  (Id.)  He believed that once she had "given her

23 best effort" in those respects, they could consider an injection

24 or possibly arthroscopy.  (Id.)

25     On March 23, 2006, Dr. Anguizola noted that Plaintiff's

26 cervical spine had decreased range of motion, pain, tenderness,

27

28        [5]    The Court refers to Dr. Timothy J. Hunt as Dr. T. Hunt
   because he shares the same last name as Dr. Robert W. Hunt.

1  and mild paraspinal muscle spasms.  (AR 434.)  He noted that

2  Plaintiff's thoracic spine had pain and tenderness and her

3  lumbosacral spine had reduced range of motion, pain, tenderness,

4  and spasm.  (AR 434-35.)  A straight-leg-raising test was

5  positive bilaterally.  (AR 435.)  Dr. Anguizola diagnosed

6  cervical disc disease, bilateral cervical facet arthropathy with

7  cerviogenic headaches, thoracic disc disease with facet

8  arthropathy, lumbosacral disc disease, bilateral lumbar

9  radiculopathy, and bilateral lumbar facet arthropathy.  (Id.)  He

10 recommended that she undergo lumbar steroid injections and

11 diagnostic facet blocks and continue her prescribed medications.

12 (AR 436.)

13      On May 1 and 15, 2006, Plaintiff received lumbar steroid

14 injections.  (AR 438-39, 447-48.)  On June 1, 2006, Dr. Anguizola

15 found that Plaintiff's cervical spine had decreased range of

16 motion, pain, tenderness, and spasm; her thoracic spine had mild

17 pain on palpation; and her lumbar spine had decreased range of

18 motion, pain, and tenderness.  (AR 454-55.)  A straight-leg-

19 raising test was negative.  (AR 455.)  Dr. Anguizola diagnosed

20 cervical disc disease, bilateral cervical facet arthropathy,

21 cerviogenic headaches, thoracic disc disease with mild facet

22 arthropathy, lumbosacral disc disease, bilateral lumbar

23 radiculopathy, bilateral lumbar facet arthropathy, and possible

24 discogenic pain.  (Id.)  Dr. Anguizola noted that Plaintiff had

25 "good pain relief" with her cervical epidural steroid injections

26 but had some residual pain.[6]  (AR 456.)  He recommended a

27

28      [6]   The record does not reflect when Plaintiff received the
cervical epidural steroid injections.

11

diagnostic lumbar facet block and suggested that she consider cervical facet blocks in the future if her pain persisted.  (Id.) On August 21, 2006, Dr. Anguizola administered a right-lumbar diagnostic facet block.  (AR 508.)

On October 16, 2006, orthopedic surgeon Daniel A. Capen diagnosed Plaintiff with mulitlevel lumbar-disc protrusion and early degenerative discopathy, cervical- and lumbar-spine strain, and morbid obesity.  (AR 536.)  He noted that Plaintiff was receiving facet blocks and recommended that she join a weight-loss program and consider obesity surgery.  (Id.)  He opined that a "combination of weight loss and water aerobics and block should suffice," but if she did not improve then she "may have to consider surgery."  (Id.)  He also opined that she needed "absolutely no cervical spine surgery" and that an exercise program would help with her cervical-spine condition.  (Id.)

On January 9, 2007, Dr. Hunt found that Plaintiff's neck was painful but had adequate range of motion, her right elbow was tender but had adequate range of motion, and her low back was tender but without paravertebral spasm.  (AR 228.)  He diagnosed cervical- and lumbar-disc displacement, "[c]ephalgia/[r]ight elbow strain," and "[c]ervicothoracic strain/bilateral knee strain."  (Id.)  On January 16, 2007, Dr. Hunt completed a supplemental report noting that Plaintiff had reduced range of motion of the knees.  (AR 223-26.)

On June 8, 2007, an MRI of Plaintiff's cervical spine showed at C2/C3, a 2.2-millimeter broad-based disc protrusion that effaced the thecal sac, patent neural foramina, and normal exiting nerve roots; at C3/C4, a 2.1-millimeter broad-based disc

12

protrusion that indented the spinal cord and left neuroforaminal narrowing causing encroachment on the left-C4 exiting nerve root; at C4/C5, a 2.1-millimeter broad-based disc protrusion that effaced the thecal sac and right neuroforaminal narrowing causing encroachment on the right-C5 exiting nerve root; at C5/C6, a 2.1-millimeter left lateral disc protrusion that effaced the thecal sac and left neuroforaminal narrowing causing encroachment on the left-C6 exiting nerve root; at C6/C7, a "subtle disc bulge" that effaced the thecal sac and bilateral neuroforaminal narrowing causing encroachment on the C7 exiting nerve root; and posterior osteophytes from C2 to C5.  (AR 403.)

That same day, a lumber-spine MRI showed at L1/L2, a 2.8-millimeter broad-based disc protrusion that abutted the thecal sac, normal neural foramina and nerve roots, and facet-joint and ligamenta-flava hypertrophy; at L2/L3, a 2.8-millimeter broad-based disc protrusion with osteophyte that effaced the thecal sac, bilateral neuroforaminal narrowing causing encroachment on the nerve roots, and significant facet-joint and ligamenta-flava hypertrophy that contributed to spinal-canal narrowing; at L3/L4, a 2.8-millimeter broad-based disc protrusion with osteophyte that effaced the thecal sac, bilateral neuroforaminal narrowing causing encroachments on the nerve roots, and significant facet-joint and ligamenta-flava hypertrophy that contributed to spinal-canal narrowing; at L4/L5, a 2.8-millimeter broad-based disc protrusion with osteophyte that effaced the thecal sac, bilateral neuroforaminal narrowing causing encroachment on the right and effacement of the left nerve roots, and significant facet-joint and ligamenta-flava hypertrophy that was contributing to spinal-

canal narrowing; at L5/S1, a 2.5-millimeter broad-based disc protrusion with osteophyte that was effacing the thecal sac, bilateral neuroforaminal narrowing causing encroachment on the right and effacement on the left nerve roots, and facet-joint and ligamenta-flava hypertrophy.  (AR 399-400.)

On June 11, 2007, Dr. Andrew R. Jarminski noted that Plaintiff had a mild antalgic gait; her right knee had some tenderness but full extension; her lumbar spine was tender with limited range of motion; and her cervical spine had tenderness, spasm, and pain.  (AR 442.)  He noted that Plaintiff had undergone a percutaneous sterostatic and radiofrequency rhizotomy in Febraury 2007, and he recommended that she obtain updated MRIs, lose weight through a weight-loss program or gastric bypass surgery, and attend pool therapy.  (AR 442-43.)  Dr. Jarminski opined that Plaintiff was temporarily totally disabled.  (AR 443.)

On July 23, 2007, Dr. Capen noted that Plaintiff had difficulty with bending and rotation of both the cervical and lumbar spine and that her obesity contributed to her low-back condition.  (AR 523.)  He found that surgery was not warranted and recommended conservative care.  (Id.)

On December 13, 2007, neurologist Robert A. Rafael found that Plaintiff had full neck range of motion, normal cranial nerves, "5/5" motor strength, "2+" reflexes, normal gait and station, normal coordination, and intact sensation.  (AR 273-75, 387-88.)  Dr. Rafael noted that Plaintiff's neurological exam was within normal limits and diagnosed posttraumatic headaches and headaches secondary to cervical strain, but he found "no history"

1    that was "suggestive of migraine headaches." (AR 274.)

2         On January 28, 2008, Dr. Khiem D. Dao diagnosed Plaintiff
3    with right chronic lateral epicondylitis and recommended a
4    cortisone injection. (AR 470.) On February 3, 2009, Dr. Arthur
5    Q. Nuval and Dr. Douglas E. Garland noted that Plaintiff was
6    complaining of neck, right-elbow, low-back, and bilateral knee
7    problems. (AR 720.) They noted that x-rays showed loss of
8    lordosis of the neck and bilateral chondromalacia patella and
9    that MRIs showed some cervical- and lumbar-spine degenerative
10   disc disease and possible tear of the meniscus. (Id.) X-rays of
11   the elbow and lumbar spine were normal. (Id.) They diagnosed
12   chronic cervical strain, chronic lumbar strain, right tennis
13   elbow, and bilateral chondromalacia patella. (Id.) They
14   injected Plaintiff's right elbow with steroids and prescribed
15   Soma for muscle relaxation and Ultram for pain.[7] (Id.)

16        On February 12, 2008, orthopedic surgeon Dr. T. Hunt
17   evaluated Plaintiff's right knee. (AR 252-57.) He noted that
18   Plaintiff was five feet, four inches tall, weighed 270 pounds,
19   and denied taking medications at that time. (AR 254.) He found
20   that Plaintiff's right knee was tender with "slightly decreased"
21   mobility, and she had a negative straight-leg-raising test.
22   (Id.) Dr. T. Hunt noted that x-rays showed appropriate alignment

23   _____

24        [7]    Soma, or carisoprodol, is a muscle relaxant that is
     used with rest, physical therapy, and other measures to relax
25   muscles and relieve pain and discomfort caused by strains,
     sprains, and other muscle injuries. Carisoprodol, MedlinePlus,
26   http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html
     (last updated Aug. 1, 2010). Ultram, or tramadol, is an opiate
27   agonist used to relieve moderate to moderately severe pain.
     Tramadol, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
28   druginfo/meds/a695011.html (last updated Oct. 15, 2011).

with no significant joint-space narrowing and that an MR arthrogram of Plaintiff's right knee did not show "any obvious meniscal pathology" despite the radiologist's contrary findings on the report.  (AR 255-56.)  He diagnosed right-knee patellofemoral syndrome and chrondomalacia, noted that she should lose 100 to 120 pounds and strengthen her muscles, and offered her a cortisone injection, which she declined.  (AR 255.)  Dr. T. Hunt noted that after receiving an injection, Plaintiff could be considered for an arthroscopy, but he would not consider more aggressive treatment until she was "close to ideal body weight."  (Id.)  Dr. T. Hunt also noted that it was possible that once she was the ideal body weight, she would "not need to do anything at all."  (AR 256.)  On March 13, 2008, Plaintiff settled her worker's compensation case.  (AR 237.)

On November 17, 2008, Dr. Concepcion A. Enriquez, who was "board eligible" in internal medicine, examined Plaintiff at the Social Security Administration's request.  (AR 598-602.)  Dr. Enriquez noted that Plaintiff weighed 270 pounds.  (AR 599.)  Her cervical spine was tender with decreased range of motion of 70/80 degrees on left lateral rotation.  (AR 600.)  Plaintiff's lumbar spine was tender with decreased range of motion, but she had no muscle spasms and a negative straight-leg-raising test.  (Id.)  Dr. Enriquez found that Plaintiff had no signs of radiculopathy and normal range of motion of the shoulders, elbows, wrists, hands, hips, and ankles.  (AR 600-02.)  Her range of motion of both knees was decreased to 130/150 degrees on flexion secondary to obesity, and her right knee was tender.  (AR 601.)  Plaintiff had normal muscle tone and bulk without atrophy, "5/5" strength

throughout, intact sensation, and normal reflexes.  (Id.)  She had a "very mild" limp on the right but normal balance, and she could walk without an assistive device.  (Id.)  Dr. Enriquez noted that the May 2005 right-knee MRI showed chondromalacia of the patella and a sprain of the medial collateral ligament and that the June 2007 MRIs of her cervical, thoracic, and lumbosacral spine showed "moderate abnormalities," especially in the lumbosacral-spine area.  (AR 601-02.)  Dr. Enriquez opined that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for six hours and sit for six hours in an eight-hour workday; and occasionally bend, stoop, twist, squat, crouch, or kneel.  (AR 602.)  She believed that Plaintiff must avoid unprotected heights and operating dangerous machines.  (Id.)

On December 9, 2008, state-agency medical consultant Dr. R. May reviewed Plaintiff's medical records and completed a physical-residual-functional-capacity assessment.  (AR 608-13.) Dr. May found that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for about six hours and sit for about six hours in an eight-hour day; occasionally climb, balance, stoop, kneel, crouch, or crawl; and never climb ladders, ropes, or scaffolds or be exposed to hazards.  (AR 609, 611-12.)  On May 16, 2009, state-agency medical consultant Dr. Henry Scovern reviewed Dr. May's opinion and agreed with it.  (AR 626-28.)

On December 9, 2008, Dr. Nuval noted that Plaintiff complained of right-knee meniscal tear and degenerative disc disease of the lumbosacral spine.  (AR 605.)  He discussed

17

weight-reduction diet and exercise; referred her to a dietician and the orthopedics clinic; and prescribed ibuprofen, omeprazole, and cyclobenzaprine.[8]   (AR 606.)

On June 9, 2009, Dr. Garland noted that Plaintiff was following up for her tennis elbow and neck.  (AR 945.)  He injected Plaintiff's right elbow with steroids and lidocaine and prescribed physical therapy and Tramadol.  (Id.)  On August 10 and September 10, 2009, Plaintiff attended physical therapy.  (AR 834-35, 843-44.)

On April 15, 2010, an MRI of Plaintiff's cervical spine showed at C2/C3, normal disc height, normal spinal canal, and normal neural foramina; at C3/C4, mild loss of disc height, a one-to-two-millimeter broad-based protrusion that deformed the thecal sac but did not result in central spinal stenosis, and a mildly narrowed left neural foramen; at C4/C5, mild loss of disc height, a one-millimeter broad-based protrusion resulting in mild central spinal stenosis, and mild right and moderate left neural-foraminal narrowing; at C5/C6, a mild loss of disc height, two-millimeter protrusion resulting in mild central spinal stenosis,

---

[8]     Prescription ibuprofen, a nonsteroidal anti-inflamatory drug, is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Ibuprofen, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682159.html (last updated Oct. 1, 2010). Cyclobenzaprine, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. Cyclobenzaprine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (last updated Oct. 1, 2010). Omeprazole is a proton-pump inhibitor used to treat gastroesophageal-reflux disease.   Omeprazole, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html (last updated Jan. 15, 2013).

and mild bilateral neural-foraminal narrowing, left greater than right; at C7/T1, normal disc height, normal central spinal canal, and normal neural foramina; and at T1/T2, normal disc height, normal central spinal canal, and normal neural foramina.[9]  (AR 961-62.)  The radiologist's impression was mild discogenic changes of the cervical spine from C3 to C7, mild central stenosis at C4 to C6, and mild to moderate multilevel neural foraminal narrowing that was more pronounced on the right.  (AR 962.)

That same day, an MRI of Plaintiff's lumbar spine showed at L1/L2, mild loss of disc height and disc desiccation with normal central spinal canal and neural foramina; at L2/L3, mild loss of disc height and disc desiccation, two-millimeter disc bulge resulting in mild central spinal stenosis, a two-millimeter left-paracentral extrusion, patent right neural foramen, and mildly narrowed left neural foramen; at L3/L4, mild loss of disc height and disc desiccation, normal central spinal canal, mild bilateral neural foraminal narrowing that was greater on left, and hypertrophic changes of the facet joints; at L4/L5, normal disc height, normal central spinal canal, normal right neural foramen, a two-millimeter left extraforaminal protrusion resulting in moderate left neural foraminal narrowing but without evidence of neural compression, and hypertrophic changes of the facet joints; and at L5/S1, normal disc height, normal central spinal canal, mild to moderate bilateral neural foraminal narrowing, and hypertrophic changes of the facet joints.  (AR 963-64.)  The

---

[9]     The 2010 MRI made no findings as to Plaintiff's cervical spine at C6/C7.  (See AR 961-62.)

19

radiologist's impression was mild diffuse facet arthropathy of the lumbar spine, mild discogenic changes of the lumbar spine at L1-S1, mild central spinal stenosis at L2-L3 associated with a two-millimeter left paracentral extrusion that did not result in neural compression, and mild to moderate neural foraminal narrowing at L3-S1 related to disc bulge and facet arthropathy. (AR 964.)

On June 16, 2010, Dr. Garland performed an arthroscopy, menisctomy, and debridement of Plaintiff's right knee. (AR 958-60.)

### 3.  Discussion

The ALJ found that Plaintiff retained the RFC to perform a limited range of light work. (AR 24.)  In doing so, the ALJ accepted the findings of examining physician Enriquez and reviewing physicians May and Scovern, who were the only doctors who offered opinions as to Plaintiff's functional limitations. (AR 26.)

The ALJ was entitled to rely on the opinions of Drs. Enriquez, May, and Scovern to find that Plaintiff retained the RFC to perform a limited range of light work. (AR 24, 26.)  Dr. Enriquez's opinion was supported by independent clinical findings and thus constituted substantial evidence upon which the ALJ could properly rely.  See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  Dr. Enriquez conducted a full physical exam, noting that Plaintiff had decreased ranges of motion and tenderness of the knees and cervical and lumbar spine, normal muscle strength and tone, intact sensation, normal reflexes, and a "very mild

limp," among other things. (<u>See</u> AR 599-601.) Dr. Enriquez's
findings were largely consistent with those of Plaintiff's
treating physicians. (<u>See, e.g.</u>, AR 228 (Dr. Hunt's finding of
pain and "adequate" range of motion of cervical spine and pain
and tenderness, but no spasm, of lumbar spine); AR 272-73 (Dr.
Rafael's finding that Plaintiff had full range of motion of neck,
normal gait and reflexes, full strength, and intact sensation);
AR 326-27 (Dr. Anguizola's finding of reduced ranges of motion,
pain, tenderness, and spasm of cervical and lumbar spine); AR
434-35 (Dr. Anguizola's findings of neck and lumbar-spine pain,
tenderness, spasm, and decreased range of motion); AR 442 (Dr.
Jarminski's finding of mild antalgic gait, tenderness but full
extension of knee, reduced range of motion and tenderness of
lumbar spine, and tender and painful cervical spine).)

Consistent with those findings, Dr. Enriquez concluded that
Plaintiff could lift and carry 20 pounds occasionally and 10
pounds frequently; stand or walk for six hours and sit for six
hours in an eight-hour workday; and occasionally bend, stoop,
twist, squat, crouch, or kneel. (AR 602.) She believed
Plaintiff must avoid unprotected heights and operating dangerous
machines. (<u>Id.</u>) Drs. May and Scovern's opinions, moreover, were
consistent with Dr. Enriquez's findings and those of the other
physicians. <u>See</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir.
2002) ("The opinions of non-treating or non-examining physicians
may also serve as substantial evidence when the opinions are
consistent with independent clinical findings or other evidence
in the record."); 20 C.F.R. §§ 404.1527(c)(4) (ALJ will generally
give more weight to opinions that are "more consistent . . . with

the record as a whole"), 416.927(c)(4) (same).  Drs. Enriquez,

May, and Scovern also reviewed Plaintiff's medical records before

rendering their opinions.  (AR 599, 601-02, 608-13, 626-28.)  See

20 C.F.R. 404.1527(c)(3) (in weighing medical opinions, ALJ "will

evaluate the degree to which these opinions consider all of the

pertinent evidence in [claimant's] claim, including opinions of

treating and other examining sources"), 416.927(c)(3) (same).

Indeed, the opinions of Drs. Enriquez, May, and Scovern are

uncontradicted because no other physician offered any opinion as

to Plaintiff's functional impairments.

Plaintiff nevertheless argues that the opinions of Drs.

Enriquez, May, and Scovern could not serve as substantial

evidence supporting the ALJ's decision because they were rendered

before Plaintiff underwent right-knee surgery and obtained

updated cervical- and lumbar-spine MRIs.  (J. Stip. at 5.)  The

ALJ, however, acknowledged Plaintiff's right-knee surgery but

found "no reason to believe it was not successful," a finding

Plaintiff does not challenge.  (AR 26.)  Indeed, Plaintiff cites

no evidence showing that her condition worsened, rather than

improved, as a result of her surgery, or even that she had any

specific knee limitations that were inconsistent with her RFC.

(See J. Stip. at 4-6, 9-10.)  At the July 2010 hearing, Plaintiff

testified that she had undergone knee surgery five weeks earlier

but did not say that it had failed or in any way caused her

condition to worsen.  (AR 40.)

Plaintiff also fails to cite any specific findings from the

2010 MRIs that conflicted with her RFC (see J. Stip. at  4-6, 9-

10); in fact, the June 2007 cervical- and lumbar-spine MRIs –

which Drs. Enriquez, May, and Scovern reviewed – actually reflect similar or perhaps more serious findings than the later April 2010 MRIs.  For example, Plaintiff's 2007 cervical-spine MRI showed a 2.2-millimeter disc protrusion at C2/C3; 2.1-millimeter disc protrusions at C3/C4, C4/C5, and C5/C6; and a "subtle" disc bulge at C6/C7 (AR 403), while her 2010 cervical-spine MRI showed no disc protrusion at C2/C3, a one-to-two-millimeter disc protrusion at C3/C4, a one-millimeter disc protrusion at C4/C5, and a two-millimeter disc protrusion at C5/C6 (AR 961). Plaintiff's 2007 lumbar-spine MRI showed 2.8-millimeter disc protrusions at L1/L2, L2/L3, L3/L4, and L4/L5 and a 2.5-millimeter disc protrusion at L5/S1 (AR 399-401), while her 2010 MRI showed a disc bulge of two millimeters at L2/L3 and protrusions of two millimeters at only L2/L3 and L4/L5 (AR 963-64).  Unlike the 2010 MRIs, moreover, the 2007 MRIs showed nerve-root encroachment at C3/C4, C4/C5, C5/C6, C6/C7, L2/L3, L3/L4, L4/L5, and L5/S1 as well as hypertrophy at L1/L2 and L2/L3.  (AR 399-401.)  Contrary to Plaintiff's claim, therefore, records of her knee surgery and her updated MRIs fail in any way to "demonstrate that [she] has a more restrictive RFC than found by the ALJ."  (J. Stip. at 5.)

Plaintiff also argues that the ALJ's finding that she could stand for six hours in an eight-hour day "borders on the fantastic . . . in light of [her] degenerative disease of the cervical and lumbar spine and bilateral knees with the added impairment of extreme obesity."  (J. Stip. at 5.)  Plaintiff again cites no evidence in support of her assertions, and all three doctors who offered opinions as to Plaintiff's functional

limitations found otherwise.  <u>See</u> 20 C.F.R. §§ 404.1512(a) ("you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s) and . . . its effect on your ability to work on a sustained basis"), 416.912(a) (same).  Plaintiff relies on <u>Barrett v. Barnhart</u>, 355 F.3d 1065 (7th Cir. 2004), but in that case the Seventh Circuit rejected an ALJ's RFC finding because the court "d[id] not know on what basis [the ALJ] decided that [the claimant] can stand for two hours at a time," noting that "[n]o physician said that" and the finding had "no evidentiary basis."  <u>Id.</u>  Here, however, the ALJ relied on the uncontroverted opinions of three physicians.

Finally, Plaintiff argues that the ALJ "failed in his affirmative obligation to fully and fairly develop the record" because he "made no effort to utilize a medical expert or arrange a consultative examination" after she submitted her surgery report and 2010 MRIs.  (J. Stip. at 5-6.)  But those records were not ambiguous, nor did they in any way conflict with the earlier evidence.  As such, they did not trigger the ALJ's duty to develop the record.  <u>See</u> <u>Mayes v. Massanari</u>, 276 F.3d 453, 459-60 (9th Cir. 2001) (holding that ALJ's duty to further develop record triggered only when record contains ambiguous evidence or is inadequate to allow for proper evaluation of evidence).  Moreover, Plaintiff's reliance on Social Security Ruling 96-6p (J. Stip. at 6) is misplaced because that ruling states that a medical-expert opinion is required "[w]hen additional medical evidence is received that in the opinion of the [ALJ] may change [a medical consultant's] finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of

24

Impairments." <u>See</u> SSR 96-6p, 1996 WL 374180, at *4.  The ALJ made no such finding here, and Plaintiff fails to even assert that her impairments equaled any Listing.  <u>Cf.</u> <u>Burch v. Barnhart</u>, 400 F.3d 676, 683 (9th Cir. 2005) ("An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence.").

Plaintiff is not entitled to remand on this ground.

B.   <u>The ALJ Properly Assessed Plaintiff's Credibility</u>

Plaintiff argues that the ALJ's credibility determination must be reversed because it "lacks the requisite support of substantial evidence" and was "a result of legal error."  (J. Stip. at 10.)

1.   <u>Applicable law</u>

An ALJ's assessment of pain severity and claimant credibility is entitled to "great weight."  <u>See</u> <u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  <u>Molina v. Astrue</u>, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks and citation omitted).  In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  <u>See</u> <u>Lingenfelter</u>, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be

1  expected to produce the pain or other symptoms alleged." <u>Id.</u> at

2  1036 (internal quotation marks omitted).  If such objective

3  medical evidence exists, the ALJ may not reject a claimant's

4  testimony "simply because there is no showing that the impairment

5  can reasonably produce the *degree* of symptom alleged." <u>Smolen</u>,

6  80 F.3d at 1282 (emphasis in original).  When the ALJ finds a

7  claimant's subjective complaints not credible, the ALJ must make

8  specific findings that support the conclusion.  <u>See</u> <u>Berry v.</u>

9  <u>Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative

10 evidence of malingering, those findings must provide "clear and

11 convincing" reasons for rejecting the claimant's testimony.

12 <u>Lester</u>, 81 F.3d at 834.  If the ALJ's credibility finding is

13 supported by substantial evidence in the record, the reviewing

14 court "may not engage in second-guessing." <u>Thomas</u>, 278 F.3d at

15 959.

16              2.   <u>Relevant facts</u>

17      In an undated disability report, Plaintiff wrote that she

18 was unable to work because of "[t]wo disc injuries in [her] neck

19 and five on [her] lower back," right-elbow tendonitis, "planter

20 problems," and "left foot surgeries."  (AR 154.)  She said that

21 her conditions caused pain and difficulty bending, standing,

22 pushing, pulling, and grasping with her hands.  (<u>Id.</u>)

23      In an October 5, 2008 function report, Plaintiff wrote that

24 her daily activities included watching television, making lunch

25 and dinner, and sometimes going to the doctor.  (AR 171.)  She

26 tried to go for walks but had to stop and rest after about five

27 minutes.  (<u>Id.</u>)  Plaintiff washed dishes but had to stop and rest

28 because her back would hurt after standing for too long.  (<u>Id.</u>)

She took care of her animals by giving them food and water.  (AR 172.)  Plaintiff said she had problems with personal care because bending her legs to put on her pants was difficult, her back hurt after showering, and her elbows hurt when she combed her hair or held a cup, among other things.  (Id.)

Plaintiff said that she went outside a few times a week and would travel as a passenger in a car or by public transportation. (AR 174.)  She did laundry but needed help carrying it up the stairs.  (AR 173.)  Plaintiff shopped for food every few days for about an hour at a time.  (AR 174.)  She could count change, handle a savings account, and use a checkbook or money orders. (Id.)  Plaintiff said that she loved to read but that her eyes had "changed" since she got hurt.  (AR 175.)  She went to dinner or the movies with friends about twice a week and also communicated with them on the phone and over the computer.  (Id.) She regularly went to movies, concerts, and her friend's house. (Id.)  Plaintiff wrote that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, complete tasks, and use her hands.  (AR 176.)  She could walk for five minutes before needing to rest for five minutes.  (Id.)  She said that it was hard for her to pay attention but she could follow spoken and written directions. (Id.)  Plaintiff sometimes used a cane in the house but it had not been prescribed by a doctor.  (AR 177.)

At the July 22, 2010 hearing before the ALJ, Plaintiff testified that she was unable to work because her knees hurt and because, while working as a bus driver, she had developed neck, back, and elbow pain after "a couple of rear endings of the bus."

27

(AR 39.)  She said her neck injuries caused headaches and pain that radiated down her back and that her lower-back pain radiated down her hips and to both knees.  (AR 39-40.)  She said her doctors had recommended that she lose weight.[10]  (AR 41.)  Plaintiff said that lying down usually helped to relieve her pain and that her medications relieved her pain "a little bit."  (Id.)  Plaintiff testified that she could walk for about five minutes or stand for "one second" before having pain.  (AR 43.)  She usually prepared frozen meals, and when she did cook she usually sat on a stool.  (Id.)  Plaintiff said she could shop in a grocery store, wash dishes for a couple minutes before her lower back started hurting, and shower herself with some difficulty.  (AR 43-45.)

### 3.   Discussion

The ALJ found that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms but that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with" an RFC for a limited range of light work.  (AR 25.)  Reversal is not warranted based on the ALJ's alleged failure to make proper credibility findings or properly consider Plaintiff's subjective symptoms.

First, the ALJ properly discounted Plaintiff's credibility

---

[10]    Plaintiff also testified that she had "gained about 40 pounds" in the last "couple years."  (AR 41.)  In fact, although the record does not seem to contain an indication of her weight at the time of the July 2010 hearing, it fluctuated by only two pounds from May 2005, when she weighed 275 (AR 369), to February 2010, five months before the hearing, when she weighed 277 (AR 814).  At many points during that five-year period, she weighed 270 or less.  (See, e.g., AR 254, 467, 598, 875.)

based on her "poor work history," which showed that she had "earned amounts above the substantial gainful activity level in only four years." (AR 27.)  Indeed, Plaintiff's work-history report shows that she had no earnings at all from 1984 to 1985 and from 1988 to 1998. (AR 129.)  And in eight of the 12 years that she did work, her wages ranged from only a couple hundred dollars to about $8000 a year. (Id.)  Indeed, Plaintiff herself acknowledges that her work history is "not a model of consistency." (J. Stip. at 13.)  Thus, this was a clear and convincing reason for discounting Plaintiff's credibility. See Thomas, 278 F.3d at 959 (credibility diminished when claimant "had an extremely poor work history and has shown little propensity to work in her lifetime" (internal quotation marks omitted)).

The ALJ also permissibly discounted Plaintiff's credibility because her statements regarding her medications conflicted with the medical record. (AR 27.)  See Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (ALJ permissibly discounted credibility when claimant's "statements at her hearing [did] not comport with objective evidence in her medical record"); Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); see also Garcia v. Comm'r of Soc. Sec. Admin., 498 F. App'x 710, 711 (9th Cir. 2012) (ALJ permissibly discounted plaintiff's credibility based on conflicts between his testimony and doctor's testimony).  Plaintiff's September 2008 treatment records show that her only "active" prescription was for the

29

antifungal medication fluconazole, which was last filled in December 2007.[11]  (AR 659, 661, 663.)  In November 2008, however, Plaintiff reported to Dr. Enriquez that she was currently taking Soma, a muscle relaxant; Darvocet, a narcotic pain reliever; Midrin, a migraine medication; and orphenadrine citrate, another muscle relaxant.[12]  (AR 599.)  Plaintiff's December 2008 treatment note, moreover, showed that prescriptions had been filled that day for only ibuprofen, a nonsteroidal anti-inflammatory drug; cyclobenzaprine, a muscle relaxant; and omeprazole, a proton-pump inhibitor.  (AR 604.)  The ALJ reasonably discounted Plaintiff's credibility based on that inconsistency.

Plaintiff contends that her "prescription history demonstrates that the ALJ's statement is factually inaccurate," and cites, in support, a June 2009 medication list.  (J. Stip. at 13 (citing AR 630-31).)  That list of "active medications" does

---

[11]    Fluconazole is a triazole used to treat fungal infections.  Fluconazole, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a690002.html (last updated Dec. 15, 2011).

[12]    Darvocet is a combination of acetaminophen and propoxyphene, a narcotic pain reliever, which was used to relieve mild to moderate pain before being withdrawn from the market in 2010.  Darvocet, Drugs.com, http://www.drugs.com/darvocet.html (last updated Dec. 13, 2010); Propoxyphene, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682325.html (last updated Feb. 1, 2011).  Midrin is a medication used to relieve tension and migraine headaches.  Drugs & Medications - MIDRIN Oral, WebMD, http://www.webmd.com/drugs/drug-6603-MIDRIN+Oral.aspx?drugid=6603&drugname=MIDRIN+Oral (last accessed June 13, 2013).  Orphenadrine is a skeletal muscle relaxant that is used with other measures to relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  Orphenadrine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682162.html (last updated Dec. 1, 2010).

include carisoprodol, the generic form of Soma, but states only that it was last filled in May 2009, well after Plaintiff's November 2008 examination with Dr. Enriquez. (AR 630.) The medication list also notes that Plaintiff filled a prescription for the narcotic pain relievers hydrocodone-acetaminophen in March 2009 and tramadol in February 2009, also postdating her November 2008 examination.[13] (AR 631.) The medication list therefore does not establish that the ALJ's finding was "factually inaccurate."

One of the ALJ's reasons for finding that Plaintiff's subjective symptoms were not as bad as she claimed might not have been clear and convincing, however. The ALJ found that Plaintiff received only "conservative care" for her impairments, including physical therapy and steroid injections to her spine and elbow, up until the time of her surgery. (AR 27.) Indeed, Plaintiff's treatment included lumbar and cervical epidural injections (AR 217, 438-39, 447-48), a right-lumbar facet block (AR 508-09), and a stereostatic and radiofrequency rhizotomy (AR 442-43). Epidural and steroid injections, however, may not be consistent with a finding of conservative treatment. See Tagle v. Astrue, No. CV-11-7093-SP, 2012 WL 4364242, at *4 (C.D. Cal. Sept. 21, 2012) ("While physical therapy and pain medication are conservative, epidural and trigger point injections are not."); Christie v. Astrue, No. CV 10-3448-PJW, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to characterize steroid,

_____

[13]   Hydrocodone is a narcotic analgesic used in combination with other ingredients to relieve moderate to severe pain. Hydrocodone, MedlinePlus, http://www.nlm.nih.gov/medlineplus /druginfo/meds/a601006.html (last updated May 15, 2013).

trigger-point, and epidural injections as conservative). Despite that potential error, however, remand is not required because the remainder of the ALJ's credibility findings were supported by substantial evidence in the record. See Carmickle, 533 F.3d at 1162; Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004). This Court may not "second-guess" the ALJ's credibility finding simply because the evidence may have been susceptible of other interpretations more favorable to Plaintiff.[14] See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008). Reversal is therefore not warranted on this basis.

---

[14]    The parties contend that the ALJ discounted Plaintiff's credibility based on her daily activities (J. Stip. at 12-13, 15-16, 18); however, it appears that in determining Plaintiff's RFC, the ALJ actually discredited the statements of a third party, Plaintiff's friend Yvonne Bonds, based on Plaintiff's own statements regarding her abilities (see AR 27 (summarizing Bond's report and stating that "I do not find these statements credible" based on, among other things, Plaintiff's statements that she could take public transportation and was able to bathe and groom herself)).

**VI.   CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[15] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.


DATED: June 25, 2013

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[15]     This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

33